UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                  Case No. 19-CR-155

JUSTIN A. BEHN,

        Defendant.

_____

## UNITED STATES' SENTENCING MEMORANDUM
_____

The United States, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Erica J. Lounsberry, Assistant United States Attorney, hereby submits the following memorandum in advance of sentencing. The purpose of this memorandum is to highlight aspects of Behn's conduct and history that support the United States' sentencing recommendation.

## I.    OVERVIEW AND PROCEDURAL HISTORY

Justin A. Behn was arrested on a federal warrant on August 20, 2019 and charged by complaint with one count of Possession of a Firearm by a Felon in violation of Title 18, United States Code, Section 922(g)(1) and 924(a)(2). Subsequently, on September 4, 2019, Behn was indicted by a grand jury sitting in this district and charged with two counts of Possession of a Firearm by a Felon in violation of Title 18, United States Code, Section 922(g)(1) and 924(a)(2). These counts collectively charged Behn with possessing a total of six firearms and thousands of rounds of ammunition.

1

Behn signed a plea agreement on October 23, 2019, and, on November 19, 2019, he pled guilty before Magistrate Judge Nancy Joseph to Count One of the indictment. On December 18, 2019, this Court adopted Magistrate Joseph's recommendation and accepted Behn's guilty plea.

Behn has sought to characterize himself as an exemplary member of the community: building a successful business, engaging in healthy relationships, and enjoying the full support of his family. His prior contacts with the criminal justice system and the facts surrounding this case, however, paint a different picture. They demonstrate Behn's quick temper and self-importance—attributes that highlight the danger Behn poses to the community, particularly when he has access to firearms. These patterns, discussed in greater detail below, form the basis for the government's recommendation of a sentence of 18 months of incarceration.

## II. APPLICABLE LAW

The sentence the Court imposes should be sufficient, though not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, adequately punish the crime committed, deter other criminal conduct, protect the public from the defendant, and provide for any particularized needs of the defendant. 18 U.S.C. § 3553(a)(2). In determining the appropriate sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007). In addition to the goals outlined above, these factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the Sentencing Guidelines range; and the need to avoid unwarranted disparities among similarly situated defendants.

Courts should impose sentences that take a holistic view of a defendant's characteristics and conduct, as well as the impact of that conduct on the community. In doing so, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he

may consider, or the source from which it may come." *United States v. Jones*, 635 F.3d 909, 917 (7th Cir. 2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). This principle is echoed in 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also* 18 U.S.C. § 3553(a)(1) (directing consideration of the "history and characteristics of the defendant"). "The facts that a sentencing judge finds in determining what sentence to impose—such facts as the defendant's criminal history, his cooperation or lack thereof in the government's investigation, and his remorse or lack thereof—need be found only by a preponderance of the evidence." *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007).

## III.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

On August 20, 2019, federal agents seized two rifles, one shotgun, three handguns, and approximately 2,300 rounds of five different types of ammunition from Behn's home and Behn's RV. The physical and testimonial evidence gathered during this investigation show that Behn is not the type of defendant who merely kept a pistol under his mattress for safety, possessed a rifle for hunting, or continued to maintain a firearm that predated his felony convictions. Instead, Behn actively traded firearms, shot firearms, and used firearms to impress, intimidate, and threaten.

### A.    Behn's Acquisition and Sale of Firearms

Since Behn could not legally purchase or possess firearms, he made trades with acquaintances instead. The investigation into Behn's possession of firearms began when witness SOI-2 surrendered two firearms, a rifle and a shotgun, which he had purchased from Behn in early 2019. SOI-2 was also familiar with Behn striking deals with clients of his power sports business where firearms were sometimes used as a form of payment. He provided law enforcement with

text messages that he received from Behn in January 2019, in which Behn explained that someone wanted to trade an AR-15 rifle, depicted in photographs, for a piece of machinery.

**B.      Behn's Use and Display of Firearms**

Several witnesses were aware of Behn's constant access to firearms in 2018 and 2019. SOI-4, SOI-2, and SOI-1 all stated that Behn always carried a firearm in the console of his truck. SOI-2 further recalled that Behn frequently carried a firearm in his waistband.  SOI-4 had seen firearms in various rooms around Behn's house, some of which SOI-4 documented with photographs.  Behn brought a rifle and two handguns to SOI-3 for cleaning in June 2018.  SOI-1 witnessed Behn fire a handgun that belonged to SOI-1 in SOI-1's father's backyard in September 2018.  Each of these actions goes beyond the mere possession of a firearm.

Moreover, Behn appeared to take pride in the image he could create for himself by carrying and displaying firearms.  Behn sent a telling photograph to SOI-1 via Snapchat in 2018 or 2019:



This photograph depicts Behn looking into his bathroom mirror, chin thrust forward, and wearing sunglasses, headphones, and a muscle tank with "Venice Beach" written on it.  In his right hand, Behn is holding a .45 caliber handgun, and his finger is on the trigger.  A caption Behn added

4

reads, "It's goin down," followed by three skull emojis. Though the message does not elaborate on what precisely is "goin down," Behn's posture and the tenor of the banner make clear that Behn intends for the firearm to help him command respect. They also tend to suggest that Behn is about to engage in some encounter where he may need to use, or intends to display, the firearm. Even if Behn is only posing for his own (or SOI-1's) amusement, however, the mockery he intends to make of his lifetime ban on the possession of firearms is apparent.

More egregious still was an incident of domestic violence that occurred in February 2019, during which Behn threatened to use one of his firearms against a former intimate partner, SOI-4. SOI-4 was pregnant at the time, and Behn was aware of this fact. After punching and choking SOI-4, Behn asked, "Do you want me to go get one of my guns?" SOI-4 was understandably terrified that Behn was threatening to shoot her. These instances demonstrate that Behn views firearms as a tool to boost his ego and exert power and control over others.

## C. Efforts to Conceal Firearms from Law Enforcement

Witnesses have spoken of Behn's efforts to avoid being caught with firearms. SOI-1 and SOI-4 described how Behn titled two of his trucks in SOI-4's name. That way, if Behn were pulled over, he could plausibly claim he had no knowledge of the firearm he kept concealed in the center console. SOI-1 also safeguarded firearms for Behn while Behn served jail time in early 2019.

Behn also directly attempted to prevent law enforcement from discovering the firearms in his RV by lying to law enforcement. On the morning of August 20, 2019, when federal agents searched Behn's home, they informed him that they also had a warrant to search his RV and asked him where it was parked. (The RV had been moved from the location where law enforcement had seen it the day before.) Behn replied that the RV did not belong to him. He falsely claimed that he had merely been renting it and that he had already returned it. Later that day, however, federal

5

agents located and interviewed the woman who sold the RV to Behn and obtained a copy of the bill of sale. When agents located the RV that evening, parked at a truck stop in the area, Behn's father came to deliver the keys to them.

## D. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### a. Behn's Prior Record

While Behn's three felony convictions all occurred more than ten years ago, the frequency of Behn's contacts with law enforcement and the nature of his interactions with them speak volumes about his character. Behn has been arrested and charged in ten separate cases in the last fifteen years (including this case). He has also been issued ten traffic citations, for infractions such as racing on a public highway and operating while revoked, and twenty-one non-traffic ordinance citations relating to his business practices. Nearly all of Behn's arrests have involved significant defiance toward law enforcement, including refusing to stop, fleeing, using profanity and/or racial slurs, making threats, attempting to break free of restraints, and failing to report to jail.

In one instance in 2015, in which a sheriff's deputy was attempting to detain Behn, Behn bragged about how his attorney made more in a week than the deputy made in a year and threatened to have the deputy fired. In another instance in 2016, Behn threatened a deputy who questioned Behn that he would have his attorney "so far up [the deputy's] ass." In yet another instance in 2017, Behn called one police officer a "little bitch" and another a "fucking ni\*\*er," and he told them that he would be out of jail in an hour and the officers would "get lit the fuck up." Between 2006 and 2014, Behn violated nearly every condition of his Huber release and his subsequent probation. He also amassed more than thirty rule infractions during the custodial portion of his sentence. These incidents, combined with Behn's behavior in this case, illustrate Behn's abiding attitude that he is above the law.

6

Furthermore, Behn's criminal record includes several concerning offenses against various women in his orbit. In 2005, Behn supplied alcohol to several girls at his younger sisters' sleepover and then had sex with a highly intoxicated 14-year-old girl. In 2015, police responded to a suspicious OnStar call in which a former dating partner of Behn was asking for help. Behn was heard telling OnStar to disregard the call. Officers found Behn pursuing the woman on foot and screaming at her. The woman had sustained a bloody nose and a scratch on her arm. She admitted that Behn had broken her phone but would not explain how she was injured. In 2017, one of Behn's sisters called police multiple times to report that Behn was harassing her, including driving up and down her street to set off car alarms and remote-starting a vehicle in her garage. Although unreported, as described above, Behn also became violent with former dating partner SOI-4 and threatened to use a gun against her in 2019. These incidents raise serious concerns about Behn's willingness to use violence against others and the danger he consequently presents when in possession of firearms.

### b. Behn's Business Practices

Behn places substantial weight on the success of his business as evidence of his character and the contributions he has made to the community. A number of grievances from past clients, however, suggest that Behn has used his business to cheat others. While Behn has urged that the observations and opinions of SOI-1, SOI-2, and SOI-3 are not to be trusted due to their mutual grievances, they are not alone in their business-related complaints against Behn. Although it is still pending, a criminal case filed on November 15, 2019 in Washington County details five instances in which Behn deliberately and significantly misrepresented the age, mileage, and value of vehicles he had for sale. Additionally, on December 16, 2019, Washington County issued twenty-one separate citations against Behn for Behn's failure to properly register his business.

7

Thus, rather than putting Behn in a better light, Behn's record in business underscores that he lives only by his own rules.

## E.     APPLICABLE SENTENCING GUIDELINES

The maximum penalties for the offense of conviction in this case include up to ten years in prison, a $250,000 fine, 3 years of supervised release, and a mandatory special assessment of $100. 18 U.S.C. § 922(a)(2); 18 U.S.C. §§ 3571(b)(3), 3583(b)(2).  The base level under the United States Sentencing Guidelines for a conviction on a charge of 18 U.S.C. § 922(g)(1) and 924(a)(2), under the facts in this case, is 20.  U.S. Sentencing Guidelines Manual § 2K2.1(a)(4)(B). Additionally, a two-level increase applies because Behn possessed between 3 and 7 firearms as part of the offense.  U.S. Sentencing Guidelines Manual § 2K2.1(b)(1).

## F.     CRIMINAL JUSTICE OBJECTIVES

The factors for consideration under § 3553(a) speak to some of the most universal objectives of the criminal justice system.  Most pertinent to this case are promoting respect for the law, providing adequate deterrence, and protecting the public.

As illustrated above, Behn has shown little respect for the law or law enforcement.  From his behavior on State supervision, to his words and actions during his arrests, to his controlling and deceitful conduct toward others, Behn has repeatedly demonstrated his contempt for society's rules and expectations.  Furthermore, Behn has shown through his inability (or unwillingness) to control his temper that he presents a danger to the community.  Past jail sentences, probation, and fines appear to have had little deterrent effect on Behn.  The government therefore submits that a sentence of 18 months in federal prison is appropriate to impress upon Behn the seriousness of his conduct and dissuade him from repeating it.

8

**G.     CONCLUSION**

For the reasons set forth above, the United States believes that a sentence of 18 months, which is below the Guidelines range, is sufficient but not greater than necessary to promote respect for the law, provide just punishment, provide a measure of deterrence, and protect the public. Counsel for the government will make additional remarks at the sentencing hearing.

Dated at Milwaukee, Wisconsin, this 13th day of February, 2020.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By:     s/ *Erica J. Lounsberry*
Erica J. Lounsberry
Assistant United States Attorney
Florida Bar No.: 86095
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave., Room 530
Milwaukee, WI 53202
Tel: (414) 297-1700
Fax: (414) 297-1738
Email: erica.lounsberry@usdoj.gov

9